IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
January 7, 2014 Session

## BRIAN HERVERY v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**No. 08-07627     James C. Beasley, Jr., Judge**

**No. W2013-01189-CCA-R3-PC  -  Filed April 10, 2014**

The petitioner, Brian Hervery, appeals the denial of his petition for post-conviction relief from his convictions for attempted second degree murder, three counts of aggravated assault, and employing a firearm during the commission of a dangerous felony.  He argues that he received ineffective assistance of counsel and that his constitutional rights were violated by his being placed on a forty-eight-hour hold.  After review, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which D. KELLY THOMAS, JR. and ROGER A. PAGE, JJ., joined.

Gregory D. Allen, Memphis, Tennessee, for the appellant, Brian Hervery.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Senior Counsel; Amy P. Weirich, District Attorney General; and Stacy McEndree, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

Our opinion on direct appeal provides the following synopsis of the procedural history and underlying facts of the case:

Early on the morning of May 23, 2007, Stephanie Turner and her children, . . ., had just returned to their Memphis apartment complex and were looking at photographs inside their vehicle when an individual they knew as

"Big Man" stepped out from behind their apartment building and began firing gunshots at them. Each of the three victims subsequently identified the [petitioner] as the assailant from separate photographic lineups they were shown by the police. As a result, on December 2, 2008, the Shelby County Grand Jury returned an indictment charging the [petitioner] with the attempted second degree murder of [Turner's son], the aggravated assaults of [Turner's son], Stephanie Turner, and [Turner's daughter], and the employment of a firearm during a felony.

At the [petitioner]'s November 2009 trial, Stephanie Turner testified that early on the morning of the shooting she picked up her children, . . ., and her cousins, eighteen-year-old Christy and her nineteen-year-old brother, Jarvis, from a party where they had been celebrating Christy's high school graduation. Christy and Jarvis lived on the opposite end of the same apartment complex, and she and her children dropped them off at their apartment between 1:30 a.m. and 1:40 a.m. before driving to their own apartment, which was located approximately three to five minutes' walk away. As she was dropping Christy and Jarvis at their apartment, she noticed a group of men sitting on a wall and the [petitioner] standing by the mailboxes. Because she was curious, she lowered her window to get a better view, and the [petitioner] looked directly at her. She then drove to her apartment and parked her vehicle.

Turner testified that her son, who was in the backseat, exited the car and started toward their apartment but returned to the vehicle when she called him back to look at photographs of the graduation party that her daughter was showing her. She said he was leaning inside the open front passenger door looking at the photographs when she saw the [petitioner] step out from behind their apartment building. The area was well-lit, and she kept her eyes on the [petitioner] because she found his behavior odd. Turner described what next occurred:

> And I was just – I was looking at him and I was like, you know, it was a curiosity, I was like, what is he doing, you know, I didn't think nothing of it. And I didn't take my eyes off of him because it was strange that he [would] just step out there and be standing there at that time of morning. And as I looked, I seen his arm go up and I just heard a shot and I see [sic] the fire come from the gun. And my first instinct was to just lean over, you know, in case – I'm knowing he's shooting in our direction from the way his arm was pointing.

Turner testified that she was terrified for her own life and for the lives of her children. She said that her son reacted to the shooting by diving through the passenger door of the vehicle and knocking her through the open driver's door onto the ground with himself on top of her. He then began making his way around the back of the car while she reached back inside the vehicle, grabbed her daughter, and pulled her out onto the ground beside her. She then called 9-1-1.

Turner testified that she heard a total of four to five gunshots before the shooting stopped and that she remained on the ground until her son told her that the [petitioner] had gone. She and the children then fled the area in her vehicle until they encountered and stopped a police officer, who followed them back to the apartment.

Turner identified the photographic array from which she had identified the [petitioner] to the police as the shooter and explained that she circled his photograph multiple times because she was one hundred percent positive of her identification. She also identified a photograph showing a bullet hole in the front passenger door of her vehicle. She said that, on the night of the shooting, she identified the [petitioner] to the police as an individual who was known throughout the apartment complex by the nickname "Big Man."

Turner's son, . . ., testified that his cousin, Christy, pointed the [petitioner] out to them as they were letting her and her brother out at their apartment. A few minutes later, [Turner's son] was standing outside his own apartment beside the open passenger's door of his mother's parked vehicle when he heard the "boom" of a gunshot and "felt some fire" hit his back. At that point, he dived over his sister in the passenger seat, landing on top of his mother and knocking her through the open driver's door onto the ground. He then worked his way around to the back of the vehicle, where he was able to see the [petitioner] shooting a gun. [Turner's son] testified that the [petitioner] appeared to be aiming at him: "I see him, so I'm moving to the back of the car, side to side, and he followed me every which way I go like he's trying to aim and shoot me." [Turner's son] stated that he called out to the [petitioner], "[P]lease don't kill me, man" and that the [petitioner] stopped for a minute and then ran off.

[Turner's son] estimated that the [petitioner] fired four to five gunshots in total. He said the [petitioner] had a gun in his hand, but he was unable to tell what type of gun it was. He identified the May 27, 2008 photographic

-3-

array from which he had positively identified the [petitioner] to the police as the shooter and expressed his absolute certainty in his identification of the [petitioner] as his assailant. He also identified the baseball cap he had been wearing at the time of the shooting, which, after the shooting, had two bullet holes in the back.

Turner's daughter, . . ., who also identified the [petitioner] as the shooter in a photographic array she was shown by the police, essentially corroborated her mother's and her brother's accounts of the shooting. She acknowledged on cross-examination, however, that she never actually saw the shooter but instead relied on information relayed to her during the shooting by her mother and her brother.

Christy Jones testified that she noticed the [petitioner] standing by the mailboxes when Turner dropped her off at her apartment and that she pointed him out to the others.

Memphis Police Officer Alpha Hinds of the Crime Scene Unit testified that she found a bullet hole in the front passenger door of Turner's vehicle and a baseball cap with two bullet holes on the ground near the vehicle.

Detective John Byars of the Memphis Police Department's Felony Assault Unit testified that he received an anonymous Crime Stoppers' tip identifying the [petitioner], aka "Big Man," as the shooter. In response, he put together a photographic spreadsheet with the [petitioner]'s photograph, from which each of the three victims made a positive identification of the [petitioner].

The [petitioner] elected not to testify and rested his case without presenting any proof. Following deliberations, the jury convicted him of the indicted offenses.

At the sentencing hearing, the twenty-five-year-old [petitioner] denied that he was guilty of the offenses and suggested that the victims had identified him as the shooter because they were prejudiced against him. He then explained that three of the victims' family members had been involved in two different earlier shooting incidents with his cousin and his friend.

The [petitioner] further testified that he had entered a best interest guilty plea to voluntary manslaughter in exchange for a six-year sentence when he

was fourteen years old. He acknowledged he had a prior misdemeanor conviction for possession of marijuana, for which he had successfully completely probation, as well as charges for assault and drug paraphernalia, which had been nolle prosequied or dismissed. He stated that he had left school in the eighth grade and had never gotten his GED, but he had earned the following certificates through his participation in programs offered at the jail: anger management, life skills, moral recognition therapy, and "commitment to change." As for his social and employment history, he testified that he was the father of a four-year-old son and had worked intermittently as a landscaper since 1997.

State v. Brian Hervery, No. W2010-00675-CCA-R3-CD, 2011 WL 1225725, at *1-3 (Tenn. Crim. App. Mar. 31, 2011), perm. app. denied (Tenn. July 15, 2011). The trial court merged one of the aggravated assault convictions into the conviction for attempted second degree murder and sentenced the petitioner to concurrent terms of ten years for the attempted murder conviction and three years for each of the aggravated assault convictions. Id. at *1. Because of the petitioner's prior voluntary manslaughter conviction, the court sentenced the petitioner to ten years at 100% on the firearm conviction to be served consecutively to the ten-year sentence for attempted second degree murder. Id.

On May 1, 2012, the petitioner filed a *pro se* petition for post-conviction relief and, after the appointment of counsel, an amended petition was filed. The post-conviction court conducted an evidentiary hearing, at which the petitioner testified that on May 26, 2008, the police called him and his mother and asked him to come to the police station to talk to them. He freely and voluntarily went to speak with the detectives but was not allowed to leave afterwards. They told him that they were keeping him on a forty-eight-hour hold. He recalled that he "was in front of a camera about two days later." He was appointed a lawyer and had a preliminary hearing three weeks later.

The petitioner testified that counsel met with him about four or five times to discuss his case. They talked about how the trial would proceed and the potential witnesses and evidence against him. The petitioner felt that counsel "did a good job" but thought "he could have did better." The petitioner elaborated that counsel could have filed a motion to suppress the photographic identifications. He also thought counsel could have handled the firearm charge differently, particularly by arguing that possession or employment of a firearm was an element of his attempted second degree murder charge.

The petitioner's trial counsel testified that, in addition to the charges underlying the present post-conviction petition, he represented the petitioner in separate cases on a weapons charge in federal court and an aggravated burglary charge in state court. Counsel was able

to get the weapons charge dismissed and negotiated an attempted aggravated burglary plea on the aggravated burglary charge.

Counsel testified, after consulting his billing records, that he met with or corresponded with the petitioner more than a dozen times. Counsel said that he filed various motions on the petitioner's behalf. He did not recall specifically having a conversation with the petitioner in which the petitioner requested that counsel file a motion to suppress. However, counsel recalled their generally talking about the issue and explaining to the petitioner that the victims' ability to pick him out of a photographic array was "not really an issue" because they all knew him from the neighborhood. Counsel elaborated:

> I mean they all knew him from the neighborhood. There was no issue with them being able to pick him out of the photospread. There still was going to be an issue of their ability to perceive him at the time of the crime, his location, his clothing, the lighting. There was still going to be that issue but their ability to pick this individual, [the petitioner], out in my opinion was never an issue because they knew the [petitioner].

Counsel noted that, even if the photographic arrays had been suppressed, the victims would have still testified as they did at trial and identified the petitioner. Counsel did file a successful motion to redact the photographic arrays because of the markings made on them by the victims. Ultimately, their defense was that the State did not prove that the petitioner was the perpetrator and challenge the victims' ability to perceive the petitioner at the time of the crime and, alternatively, argue that the petitioner had no intent to kill.

Counsel testified that, with regard to the petitioner's having been placed on a forty-eight-hour hold, he did not think it was an issue and that case law clearly condemning the practice came out well after trial. Counsel noted that the petitioner did not give a statement during the hold period, and "[t]he only additional evidence . . . that the state obtained at that time was the victims actually being presented a photospread with the [petitioner] in it." He elaborated that the victims had notified police and given a description prior to the petitioner's being placed on a forty-eight-hour hold. The victims knew the petitioner's nickname prior to the detention period but not his real name. When the victims made positive identifications via the photographic array, the petitioner was taken before a judge and an arrest warrant was signed, slightly under the forty-eight-hour time frame.

With regard to the use of a firearm during the commission of a dangerous felony, counsel recalled having discussions concerning the jury instructions because, to his knowledge, the petitioner's case was the first time the newly-enacted crime had been tried in Shelby County. Counsel researched the issue and case law at the time and determined that

the State could rely on the attempted second degree murder charge as the predicate felony for the firearm charge because using a firearm was not an essential element of the crime of attempted second degree murder. Counsel also successfully argued for charging the jury on possession of a firearm during a dangerous felony as a lesser-included offense of the use of a firearm charge.

Following the conclusion of the proof, the post-conviction court made extensive oral findings in denying the petition. The court found that there was no basis for counsel to have filed a motion to suppress the victims' photographic identifications of the petitioner because the victims knew who the petitioner was and "recognized him as Big Man as the same guy they saw at the front of the apartments, the same guy they knew from the neighborhood." The court noted that, even if the arrays had been suppressed, the victims "could have come in and testified of their own personal knowledge who he was and their ability to recognize him." The court additionally found that the forty-eight-hour hold was not an issue "that impacted or affected this case." The court determined that the petitioner was not held improperly and that, had counsel attacked the legality of the hold, there was nothing the court "would have suppressed as a result of it because it does not appear that . . . anything in any way prejudiced [the petitioner]." The court elaborated:

> I don't think that there was a valid basis for arguing the forty-eight hour hold issue. I think the officers had sufficient evidence to arrest [the petitioner] based on the identification of the victims. I think the photospread that was created based upon the fact that they subsequently determined that Big Man was the name; Big Man was connected to [the petitioner], and once he was placed in a photo-lineup they did identify his face but they all testified that they knew him already and knew him from the neighborhood and so I don't think that it would have had any merit or would have impacted or changed the outcome of the case.

## ANALYSIS

### I. Ineffective Assistance of Counsel

The petitioner argues that he received ineffective assistance of counsel because counsel failed to investigate and raise an issue concerning his being placed on an "illegal" forty-eight-hour hold, failed to file a motion to suppress the victims' identification, and failed to raise issues concerning the employing a firearm during the commission of a dangerous felony conviction. He also argues that he was prejudiced by the totality of the errors.

The post-conviction petitioner bears the burden of proving his allegations by clear and

convincing evidence. See Tenn. Code Ann. § 40-30-110(f). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review involves purely factual issues, the appellate court should not reweigh or reevaluate the evidence. See Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a post-convictions court's application of the law to the facts of the case is *de novo*, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed *de novo*, with a presumption of correctness given only to the post-conviction court's findings of fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001); Burns v. State, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. Strickland v. Washington, 466 U.S. 668, 687 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). Moreover, the reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, see Strickland, 466 U.S. at 690, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. See Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). The prejudice prong of the test is satisfied by showing a reasonable probability, i.e., a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

Courts need not approach the Strickland test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697; see also Goad, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

The petitioner first argues that counsel was ineffective for failing to challenge his being placed on a forty-eight-hour hold. The post-conviction court determined that there was no ineffectiveness because there was not "a valid basis for arguing the forty-eight-hour hold issue." The court held that the police had sufficient information to arrest the petitioner but that, regardless, there was nothing that the court would have suppressed had counsel challenged the hold that would have impacted or changed the outcome of the case.

The record supports the post-conviction court's determination. Even though the Memphis Police Department's practice of the forty-eight-hour hold has been condemned, see State v. Courtney Bishop, No. W2010-01207-CCA-R3-CD, 2012 WL 938969, at *7-8 (Tenn. Crim. App. Mar. 14, 2012), rev'd __ S.W.3d __, 2014 WL 888198 (Tenn. 2014), the police arguably had probable cause to arrest the petitioner at the time of his detention because they knew that a person known as "Big Man," who was known to and could be identified by the victims, was the gunman and lacked only the petitioner's actual name. In any event, the record shows that the petitioner gave no statement during the detention period and that the only information obtained during that time was the victims' making photographic identifications of the petitioner. However, the victims would have, regardless, been able to identify the petitioner in court because they knew him from the neighborhood. The petitioner has, therefore, shown no prejudice caused by counsel's failure to challenge the forty-eight-hour hold.

The petitioner also argues an interrelated issue that counsel was ineffective for failing to file a motion to suppress the victims' identification of him from a photographic array because of the identifications having been made during the detention period. The post-conviction court determined that there was no basis for counsel to file a motion to suppress because "there was no question" that the victims knew the petitioner. The record supports this determination. Moreover, even if the victims' photographic identifications of the petitioner had been suppressed, the victims would have still identified the petitioner at trial. The petitioner has shown no prejudice caused by counsel's not filing a motion to suppress.

The petitioner argues that counsel was ineffective for failing to raise issues concerning the employing a firearm during the commission of a dangerous felony conviction. He asserts that counsel was ineffective for failing to require the State to declare which dangerous felony "it intended to seek enhancement" and request a bifurcated hearing as required by the statute, which resulted in his receiving a ten-year sentence for employing a firearm during the

commission of a dangerous felony. He relies on State v. Trutonio Yancey and Bernard McThune, No. W2011-01543-CCA-R3-CD, 2012 WL 4057369, at *7-9 (Tenn. Crim. App. Sept. 17, 2012), perm. app. denied (Tenn. Jan. 14, 2013), as support for his argument that counsel was ineffective for not requiring the State to elect the predicate dangerous felony relied on for the firearm conviction. However, Trutonio Yancey involved a situation where there were two possible charges on which the jury could deliberate as the predicate felony, id., but this case involved only attempted second degree murder and its lesser-included offense of attempted voluntary manslaughter as the potential predicate felony, and the court specifically charged the jury that it could only consider the firearm charge if it found the petitioner guilty of attempted second degree murder or its lesser-included offense of attempted voluntary manslaughter. The petitioner has shown no prejudice due to counsel's not requiring the State to elect a predicate felony.

With regard to the petitioner's allegation that counsel failed to request a bifurcated hearing as provided for by the statute, the petitioner did not raise the issue in his petitions, ask questions about the issue at the hearing, or make any argument to the post-conviction court concerning the issue and has therefore waived review of this issue. In any event, the record shows that the trial court conducted a bifurcated hearing on the petitioner's prior conviction. At the hearing, it appears that the State and the defense entered into a stipulation regarding the petitioner's prior conviction, after which the issue was put to the jury and it determined that the petitioner had a prior conviction for voluntary manslaughter. Accordingly, the petitioner has failed to prove any deficiency in counsel's performance or prejudice.

Given our determination that there were no errors that caused prejudice to the petitioner, we respectfully disagree with the petitioner's assertion that he was prejudiced by the totality of the errors.

## II. Forty-Eight-Hour Hold

The petitioner also argues that the post-conviction court erred in ruling that he was not prejudiced or his constitutional rights violated due to his being placed on a forty-eight-hour hold. We disagree with the petitioner's assertion. As we detailed above, the record shows that the petitioner gave no statement during the detention period and that the only information obtained during that time was the victims' making photographic identifications of him. However, the victims knew the petitioner from the neighborhood and would have, regardless, been able to identify him in court. The evidence supports the post-conviction court's finding that the petitioner suffered no prejudice.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the denial of the petition.

_____
ALAN E. GLENN, JUDGE